**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| ASHLEY MARIE TIRPAK, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 13-143 |
| | ) | |
| v. | ) | Judge Cathy Bissoon |
| | ) | Magistrate Judge Susan Baxter |
| CAROLYN W. COLVIN, | ) | |
| Acting Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

## I.    RECOMMENDATION

It is respectfully recommended that the Court deny Plaintiff's Motion for Summary Judgment (ECF No. 9), grant Defendant's Motion for Summary Judgment (ECF No. 11), and affirm the decision of the administrative law judge ("ALJ").

## II.    REPORT

### A.    BACKGROUND

#### 1.    Procedural History

Ashley Marie Tirpak ("Plaintiff") brings this action pursuant to 42 U.S.C. § 405(g), seeking review of the final determination of the Commissioner of Social Security ("Defendant" or "Commissioner") denying her applications for Disability Insurance Benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. § 401, *et seq.* and § 1381 *et seq.* ("Act").  Plaintiff filed for benefits, claiming a complete inability to work as of January 1, 2010, due to depression, anxiety, post-traumatic stress disorder ("PTSD"), attention deficit disorder ("ADD"), a learning disability, personality disorder, and a

left elbow impairment. (R. at 20, 234).[1] Her applications were denied (R. at 104-109), and having exhausted all administrative remedies, this matter now comes before the Court on cross motions for summary judgment. (ECF Nos. 9, 11).

2.      General Background

Plaintiff was twenty seven years old on the date of the ALJ's decision and has a high school education. (R. at 25). She received special education support while in high school in the area of mathematics and to address symptoms of ADHD. (R. at 317). Plaintiff's IQ scores fell within the average range of intellectual functioning. (R. at 315). Following high school, Plaintiff's job history included employment as cashier, food prep worker, and day care worker. (R. at 25, 235, 255).

3.      Treatment History

*Mental Impairments*

Plaintiff was evaluated by Rose Ann Flick, CRNP on March 20, 2009 at St. Vincent Health Center for complaints of anxiety and depression. (R. at 461-463). Plaintiff reported suffering from anxiety, which she described as "mood swing[s]," and further reported marital difficulties, trouble focusing, and trouble sleeping. (R. at 461). She denied any psychotic symptoms or suicidal thoughts. (R. at 461). She stated that Adderall and Strattera made her feel liked a "zombie." (R. at 461). Ms. Flick reported that Plaintiff presented as fidgety with an incongruent mood when talking about past physical abuse. (R. at 462). She found Plaintiff alert, well-oriented, and able to decipher the glass house proverb. (R. at 462). Plaintiff could perform simple math problems, but was unable to perform serial seven subtraction. (R. at 462). Ms.

---

[1] References to the administrative record (ECF No. 6), will be designated by the citation "(R. at ___)". Plaintiff previously filed an application for benefits on May 13, 2009 that was denied on October 29, 2009. (R. at 18). Plaintiff did not appeal that decision any further. (R. at 18). In the decision that is the subject of the instant appeal, the ALJ found no basis for reopening the prior application, and noted that any discussion of the evidence prior to October 29, 2009 was for historical and contextual purposes only. (R. at 18).

Flick was of the view that Plaintiff was "street smart" rather than "book smart." (R. at 462). Ms. Flick's diagnostic impressions were rule out PTSD; rule out organic brain disorder due to a fractured skull as an infant; most likely a history of reactive attachment disorder; learning disabilities; and adjustment disorder with mixed features of depression and anxiety. (R. at 462-463). Ms. Flick assigned her a Global Assessment of Functioning ("GAF") score of 55,[2] and started her on Seroquel. (R. at 463). Plaintiff refused recommended supportive psychotherapy. (R. at 463).

On May 13, 2009, Plaintiff reported that she worked at the Country Fair. (R. at 460). She stated she was agitated, but had no psychotic symptoms or delusions. (R. at 460). Her Risperdal dosage was increased and she was started on Klonopin for agitation. (R. at 460). Plaintiff was assessed with a GAF score of 65.[3] (R. at 460). On August 14, 2009 Plaintiff complained of increased depression and irritability. (R. at 458). She was started on Celexa and assigned a GAF score of 50.[4] (R. at 458).

On October 19, 2009, Plaintiff underwent a consultative psychological evaluation performed by Glenn Bailey, Ph.D. (R. at 384-393). Plaintiff reported she was separated from her husband, and that she and her two minor children lived with her grandparents. (R. at 386). She reported a past history of physical and mental abuse. (R. at 385). Plaintiff stated that she had been treated for anxiety when younger, and that she was being treated at St. Vincent's

---

[2]The Global Assessment of Functioning Scale ("GAF") assesses an individual's psychological, social and occupational functioning with a score of 1 being the lowest and a score of 100 being the highest. The GAF score considers "psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." *American Psychiatric Association: Diagnostic and Statistical Manual of Mental Disorders* (DSM-IV-TR) 34 (4th ed. 2000). Scores between 51 and 60 indicate "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers." *Id.*

[3]An individual with a GAF score of 61 to 70 may have "mild symptoms (e.g., depressed mood and mild insomnia)" or "some difficulty in social, occupational, or school functioning … but generally functioning pretty well, has some meaningful interpersonal relationships." *Id.*

[4] An individual with a GAF score of 41 to 50 may have "[s]erious symptoms (e.g., suicidal ideation ....)" or "any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." *Id.*

Behavioral Health for a "mood disorder and post-traumatic stress disorder" at the time of the evaluation. (R. at 385-386). Plaintiff was reportedly "still bothered" by the abuse she experienced as a child. (R. at 387). Plaintiff indicated that she previously worked 40 hours a week at the Country Fair, but that her hours had been cut back to four hours a week. (R. at 385). Plaintiff reported that she took Strattera, Abilify, Celexa and clonazepam, as needed. (R. at 387). Plaintiff stated that she felt "a lot better" on medication, in that she felt normal, was "actually happy," and slept better. (R. at 387).

On examination, Plaintiff was fully oriented, her immediate and short term memories were intact, she was able to follow simple instructions and write short sentences. (R. at 388). She refused to perform the serial seven memory test. (R. at 388). Dr. Bailey found her thoughts were goal-directed and relevant, with no loose associations, tangentiality or distractibility noted. (R. at 388). Plaintiff was able to speak clearly and concisely, and she denied any thought disturbances. (R. at 389). On abstract thinking testing, Plaintiff was unable to render an interpretation of two proverbs. (R. at 389). Dr. Bailey estimated that Plaintiff had borderline intelligence, possibly in the mentally retarded range, and that her impulse control was minimal. (R. at 389). Dr. Bailey noted no problems with Plaintiff's ability to perform daily activities and noted that her concentration appeared to be "good" during the evaluation. (R. at 391). He recommended that she continue with treatment through St. Vincent. (R. at 391). He diagnosed Plaintiff with impulse control disorder, NOS; major depression, recurrent, by history; PTSD; ADD; generalized anxiety disorder; borderline personality disorder; and possibly mild mental retardation. (R. at 391). Dr. Bailey assigned her a GAF score of 55. (R. at 391).

In connection with his evaluation, Dr. Bailey opined that Plaintiff was slightly limited in her ability to understand, remember, and carry out short, simple instructions, and interact

appropriately with the public. (R. at 379). He further opined that she was moderately limited in her ability to understand, remember and carry out detailed instructions; make judgments on simple work-related decisions; interact appropriately with supervisors and co-workers; and respond appropriately to pressures and changes in the work setting. (R. at 379).

On October 28, 2009, Sharon Tarter, Ph.D., a state agency reviewing psychologist, reviewed all the medical evidence of record and completed a Mental Residual Functional Capacity Assessment form. (R. at 398-401). Dr. Tarter found that the Plaintiff was not significantly limited in a number of work-related areas, and was only moderately limited in her ability to carry out detailed instructions; maintain attention and concentration for extended periods; perform activities within a schedule; maintain regular attendance; and be punctual. (R. at 398). She further found Plaintiff was moderately limited in her ability to accept instructions; respond appropriately to criticism from supervisors; get along with co-workers; maintain socially appropriate behavior; and respond appropriately to changes in the work setting. (R. at 399).

Dr. Tarter found that Plaintiff's basic memory processes were intact, and she had the capability of working within a schedule at a consistent pace. (R. at 400). Dr. Tarter further found that Plaintiff could be expected to complete a normal workweek without exacerbation of her psychological symptoms, sustain an ordinary routine and adapt to changes without special supervision, and perform repetitive work activities without constant supervision. (R. at 400). Dr. Tarter found that Plaintiff had no restrictions in her abilities in regards to understanding and memory. (R. at 400). Plaintiff was functional with respect to her activities of daily living and social skills. (R. at 400). She afforded great weight to the assessment of Dr. Bailey, and concluded that Plaintiff could "meet the basic mental demands of competitive work on a sustained basis despite the limitations resulting from her impairment." (R. at 400).

Plaintiff returned to St. Vincent on December 22, 2009 and reported that Celexa had helped her depressive symptoms, but complained that she felt "down a lot" during the holidays. (R. at 457). She was assigned a GAF score of 45 and her Celexa dosage was increased. (R. at 457). By January 26, 2010, Plaintiff was stable on her medications and assigned a GAF score of 60. (R. at 456).

When seen at St. Vincent on May 26, 2010, Plaintiff reported increased anxiety and claimed her medications were ineffectual. (R. at 455). She was switched to Valium and Cymbalta, and assigned a GAF score of 45. (R. at 455). Plaintiff complained of depression on September 14, 2010 and her medications were adjusted. (R. at 454).

On September 22, 2010, Plaintiff underwent a second consultative psychological evaluation performed by Dr. Bailey. (R. at 424-432). Plaintiff reported that she worked 15 hours a week at the Country Fair, but claimed her boss did not like her. (R. at 425). Plaintiff indicated that she and her children still lived with her grandparents, but she stayed with her husband "off and on." (R. at 425). Plaintiff's medications consisted of Abilify, Valium, Zoloft, and an ADD medication. (R. at 426). Plaintiff was pleasant and cooperative, and informed Dr. Bailey that her medications helped regulate her moods. (R. at 427). Plaintiff reported decreased anxiety since her last evaluation, but complained of increased agitation and an inability to sleep. (R. at 427).

On examination, Dr. Bailey found her immediate memory was intact and her short term memory was fair. (R. at 427). Plaintiff had difficulty performing serial sevens, but no other difficulties were noted. (R. at 427). Dr. Bailey found Plaintiff's thoughts were goal-directed and relevant, and no loose associations, tangentiality or distractibility were noted. (R. at 428). She was able to speak clearly and concisely, and denied any thought disturbances. (R. at 428).

Plaintiff was unable to render an interpretation of two proverbs on abstract thinking testing. (R. at 428). Dr. Bailey estimated that Plaintiff had borderline intelligence, possibly mildly mentally retarded. (R. at 428). He considered her impulse control to be "minimal" and her prognosis "fair." (R. at 429-430). Dr. Bailey noted no problems with Plaintiff's ability to perform daily activities and noted that her concentration appeared to be "good" during the evaluation. (R. at 430). In addition to recommending that she continue her treatment through St. Vincent, he recommended she begin individual psychotherapy to deal with her anger. (R. at 430). He further recommended she undergo intellectual testing. (R. at 430). He diagnosed Plaintiff with impulse control disorder, NOS; major depression, by history; PTSD symptoms; ADD; generalized anxiety disorder; borderline personality features; and rule out mild mental retardation. (R. at 430-431). Dr. Bailey assigned her a GAF score of 65. (R. at 431).

In connection with his second evaluation, Dr. Bailey opined that Plaintiff's ability to understand, remember and carry out instructions was not affected by her mental impairments. (R. at 419). He further opined that she was only slightly limited in her ability to interact appropriately with the public, supervisors and co-workers, and respond appropriately to changes in a routine work setting. (R. at 419). Finally, he found that she was only moderately limited in her ability to respond appropriately to pressures in a usual work setting. (R. at 419).

Plaintiff returned to St. Vincent on October 15, 2010, and reported that her ADHD medications helped, but noted no improvement in her depression since switching medications. (R. at 453). She complained that Valium and Klonopin caused drowsiness. (R. at 453). She was prescribed Wellbutrin, and her Valium and Klonopin dosages were decreased. (R. at 453). Plaintiff was assigned a GAF score of 45. (R. at 453). By December 10, 2010, Plaintiff reported that Wellbutrin was not addressing her depression, and requested Prozac. (R. at 452).

Otherwise, Plaintiff felt her medications were "working well" and she was assessed with a GAF score of 50. (R. at 452).

On December 20, 2010, D. Mangold, a state agency reviewing physician, completed a Mental Residual Functional Capacity Assessment form, and found that Plaintiff was not significantly limited in a number of areas, but was moderately limited in her ability to remember locations and work-like procedures; understand, remember, and carry out detailed instructions; maintain attention and concentration for extended periods; perform activities within a schedule; maintain regular attendance; work in coordination or proximity to others; and complete a normal workday and workweek without interruptions from psychologically based symptoms. (R. at 479-480). He further found that Plaintiff was moderately limited in her ability to interact appropriately with the general public; accept instructions and respond appropriately to criticism from supervisors; get along with co-workers; maintain socially appropriate behavior; respond appropriately to changes in the work setting; and set realistic goals. (R. at 480).

Dr. Mangold observed that Plaintiff's school records revealed that she received special education services while in high school, and her IQ testing was in the 42nd percentile. (R. at 477). He further observed that Plaintiff had worked in the past, and was currently working as a cashier/food prep. (R. at 477). He observed that Plaintiff's psychiatric records revealed diagnoses of depression, anxiety and ADHD, and that she was prescribed Vyvanse and Zoloft. (R. at 477). He noted however, that the only narrative assessment was dated March 2009 from a nurse practitioner, and that Plaintiff had refused therapy. (R. at 477). Dr. Mangold reviewed the findings contained in Dr. Bailey's report, observing that although Dr. Bailey noted her abstract thinking was impaired, the remainder of her examination was essentially normal. (R. at 477).

Dr. Mangold concluded that Plaintiff was mentally capable of performing simple competitive work in a low contact work setting. (R. at 477).

Plaintiff began receiving treatment at Stairways Behavioral Health on May 4, 2011 following a change in insurance. (R. at 495). At her initial psychiatric evaluation on June 17, 2011, performed by Antonio Simora, D.O., Plaintiff was pleasant and cooperative, and reported that she had been off her medications for seven months. (R. at 502). She stated that she recently began to experience periods of irritability, depression and anxiety. (R. at 502). Plaintiff also reported difficulties concentrating, anger outbursts, and difficulty sleeping. (R. at 503). Plaintiff relayed her past mental health treatment history, as well as her past history of abuse. (R. at 502). She indicated that she lived with her husband and two children. (R. at 502). Plaintiff reported that she had tried several medications in the past and always felt "drugged up," but had positive results with Celexa. (R. at 503).

On mental status examination, Dr. Simora found Plaintiff was fully oriented, her eye contact was good, and her speech was clear, coherent and spontaneous, with no rapid or pressured pattern. (R. at 504). Plaintiff was able to remain focused during the evaluation. (R. at 504). Dr. Simora observed no short term memory deficits during the evaluation, her thought process was coherent, and she denied having any suicidal thoughts. (R. at 504). He found her insight into her psychiatric condition, impulse control, and judgment were fair. (R. at 504). Plaintiff was restarted on Celexa and an anti-anxiety medication. (R. at 504). Psychological and cognitive testing were recommended, and she was to participate in individual therapy. (R. at 504). Plaintiff was diagnosed with an unspecified mood disorder, PTSD, and generalized anxiety disorder. (R. at 505). She was assessed with a GAF score of 50 and 55. (R. at 505).

When seen on July 7, 2011, Plaintiff reported that her medications helped, and she denied experiencing any depression or anxiety symptoms. (R. at 507). Plaintiff requested medication for ADHD symptoms. (R. at 507). On mental status examination, Dr. Simora found Plaintiff was fully oriented, her speech was clear and coherent, her eye contact appropriate, and her mood and affect were normal. (R. at 507). Plaintiff denied having any suicidal thoughts, her thought process was coherent and appropriate, and her insight, impulse control and judgment were all "good." (R. at 507). She was assessed with a GAF score of 55 and 59, and Dr. Simora added Wellbutrin to her medication regimen. (R. at 508).

On August 18, 2011, Plaintiff reported that she stopped taking her medications after suffering from chest pain. (R. at 510). Plaintiff reported recurrent nightmares and periods of anxiety. (R. at 510). Dr. Simora reported Plaintiff's mood as depressed. (R. at 510). He discontinued the Celexa and buspar, and recommended trazodone and vistaril. (R. at 511). She was assessed with a GAF score of 59. (R. at 511). At her visit on September 20, 2011, Plaintiff was pleasant and cooperative, and assigned a GAF score of 59 and 60. (R. at 513-514).

Plaintiff returned to Dr. Simora on November 17, 2011 and complained of increased depression and anxiety. (R. at 518). She indicated that the winter months were difficult for her since it was the anniversary of several deaths in her family. (R. at 518). Plaintiff reported that she was not taking her medication regularly, but was taking vistaril for her anxiety symptoms. She further stated that she was not taking trazodone because she wanted to be available for her children at night if they needed her. (R. at 518). Dr. Simora noted that Plaintiff's mood was depressed, but her thought process was coherent, her insight into her psychiatric condition was good, and her impulse control and judgment were good. (R. at 518). Plaintiff was prescribed Paxil and assessed with a GAF score of 62. (R. at 519).

On December 11, 2011, Plaintiff reported increased periods of irritability. (R. at 521). On mental status examination, Plaintiff was alert, fully oriented, pleasant and cooperative. (R. at 521). Her impulse control and judgment were good. (R. at 521). Plaintiff was continued on vistaril and started on Topamax at bedtime for mood stabilization. (R. at 522). She was assigned a GAF score of 62. (R. at 522).

When seen on February 8, 2012, Dr. Simora reported that Plaintiff was fully oriented and her mood was normal, although she reported some episodes of irritability and occasional anxiety. (R. at 526). Plaintiff was pleasant and cooperative, and denied any suicidal thoughts. (R. at 526). Her thought process was coherent and appropriate, she was goal directed, and had no problems with focus and concentration during the session. (R. at 527). Plaintiff expressed frustration over the social security process. (R. at 572). Plaintiff's vistaril dosage was increased and she was assigned a GAF score of 62. (R. at 527). On March 7, 2012, Plaintiff requested individual therapy for her mood disorder and depression. (R. at 529).

*Physical Impairments*

Plaintiff complained of difficulties bending her left elbow following a car accident in May 2009. (R. at 424). An MRI of Plaintiff's left elbow dated May 28, 2010 revealed "very minor tendinopathy" with no ligament tears. (R. at 417).

On December 7, 2010, Plaintiff underwent a consultative physical examination performed by John Kalata, D.O. (R. at 445-451). Plaintiff complained of frequent headaches and chest pains when suffering an anxiety attack. (R. at 447). On physical examination, Dr. Kalata reported that Plaintiff's left arm had a flexor deformity. (R. at 449). Plaintiff was unable to straighten out her arm or hold weights, and she was unable to perform the thumb and finger check with her left hand. (R. at 449). Dr. Kalata noted that her left leg appeared weaker

compared to her right leg.  (R. at 449).  Dr. Kalata found Plaintiff was unable to toe walk or squat, but she was able to heal walk, and her station and gait were normal.  (R. at 449).  Her remaining physical examination was unremarkable.  (R. at 448-449).  He diagnosed the Plaintiff with, *inter alia*, left elbow flexion deformity and left leg neuropathy.  (R. at 449).

Dr. Kalata assessed Plaintiff's ability to perform work-related physical activities, opining that Plaintiff could frequently/occasionally lift and carry two to three pounds, and stand/walk one hour or less in an eight hour workday, with an unlimited ability to sit.  (R. at 436).  Dr. Kalata further opined that Plaintiff was limited in her pushing and pulling abilities with her lower extremities, and could occasionally perform postural activities such as bending, kneeling, stooping, crouching, balancing and climbing.  (R. at 436-437).  He indicated that the Plaintiff was limited in her reaching abilities, and had some environmental limitations with respect to ventilation, vibration, temperature extremes, wetness, dust and humidity.  (R. at 437).

### 4. Administrative Hearing

Plaintiff testified at the hearing held by the ALJ that she was a high school graduate, where she tested as having a normal IQ.  (R. at 38-39).  She further testified that she was allotted special learning considerations while in high school, such as extra time for taking tests.  (R. at 38).  Plaintiff lived with her husband and two children, ages two and five.  (R. at 43).  She watched the children while her husband was at work.  (R. at 43).  Plaintiff testified that she suffered from panic attacks approximately four times a day.  (R. at 41).  She further testified that she experienced sleep disturbances, had difficulty concentrating and completing tasks, but had no trouble socializing.  (R. at 45-46).  Plaintiff stated that if she did not have children, she would stay in bed.  (R. at 47).  She was able to prepare meals and perform some household chores.  (R. at 46-47).  Plaintiff testified that she was on several medications for her mental symptoms.  (R. at

43).  She further testified that some of her previous medications caused involuntary facial movements and migraines, but she stopped taking them.  (R. at 43-44).

With respect to her physical impairments, Plaintiff testified that she was in a car accident in May 2009 and injured her left elbow.  (R. at 42).  She stated she had difficulty bending her arm and dropped things.  (R. at 42).  She testified that she was unable to use her left hand to eat, but could operate a television remote control.  (R. at 42-43).  Plaintiff claimed that her hip bothered during the winter.  (R. at 51).  Plaintiff testified that she worked for a year following the accident, including double shifts.  (R. at 50).  She also testified that she had collected unemployment compensation since 2009 after her boss cut back her hours at work.  (R. at 50).  Plaintiff acknowledged that in order to collect unemployment compensation, she had to be ready and willing to accept employment.  (R. at 51).

The vocational expert was asked to assume an individual of the same age, education and work experience as Plaintiff, who was limited to lifting ten pounds occasionally and two to three pounds frequently, who could stand or walk for one hour and sit for eight hours, and could not use the left lower extremity for pushing.  (R. at 54).  The hypothetical individual could engage in occasional postural maneuvers, was limited in using the left arm for reaching occasionally, could not do work requiring her to flex the left elbow to its full extent more than 50% of the time, was right hand dominant, and must avoid poor ventilation, vibration, temperature extremes, wetness, dust and humidity.  (R. at 54).  The hypothetical individual was further limited to simple, routine, repetitive tasks, not fast paced, with only incidental interaction with co-workers and the public, and interaction with a supervisor for 1/6 of the time.  (R. at 54-55).  The vocational expert testified that such an individual could perform the jobs of a surveillance system monitor, assembler, and laborer.  (R. at 55).

**B.** ANALYSIS

1. Standard of Review

Title II of the Social Security Act provides for the payment of disability insurance benefits to those who have contributed to the program and who have become so disabled that they are unable to engage in any substantial gainful activity. 42 U.S.C. § 423(d)(1)(A). Title XVI of the Act establishes that SSI benefits are payable to those individuals who are similarly disabled and whose income and resources fall below designated levels. 42 U.S.C. § 1382(a). A person who does not have insured status under Title II may nevertheless receive benefits under Title XVI. *Compare* 42 U.S.C. § 423(a)(1) with 42 U.S.C. § 1382(a). In order to be entitled to DIB under Title II, a claimant must additionally establish that his disability existed before the expiration of his insured status. 42 U.S.C. § 423(a), (c). The ALJ found that the Plaintiff met the disability insured status requirements of the Act through December 31, 2010. (R. at 20). SSI does not have an insured status requirement.

To be eligible for social security benefits under the Act, a claimant must demonstrate to the Commissioner that he or she cannot engage in substantial gainful activity because of a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of at least twelve months. 42 U.S.C. §423(d)(1)(A); *Brewster v. Heckler,* 786 F. 2d 581, 583 (3d Cir. 1986). When reviewing a claim, the Commissioner must utilize a five-step sequential analysis to evaluate whether a claimant has met the requirements for disability. 20 C.F.R. §§ 404.1520, 416.920.

The Commissioner must determine: (1) whether the claimant is currently engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment or a combination of impairments that is severe; (3) whether the medical evidence of the claimant's

impairment or combination of impairments meets or equals the criteria listed in 20 C.F.R., Pt. 404, Subpt. P, Appx. 1; (4) whether the claimant's impairments prevent him from performing his past relevant work; and (5) if the claimant is incapable of performing his past relevant work, whether he can perform any other work which exists in the national economy. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); *see also Barnhart v. Thomas*, 540 U.S. 20, 24-5 (2003). If the claimant is determined to be unable to resume previous employment, the burden shifts to the Commissioner (Step 5) to prove that, given claimant's mental or physical limitations, age, education, and work experience, he or she is able to perform substantial gainful activity in jobs available in the national economy. *Doak v. Heckler*, 790 F. 2d 26, 28 (3d Cir. 1986).

Judicial review of the Commissioner's final decisions on disability claims is provided by statute, and is plenary as to all legal issues. 42 U.S.C. §§ 405(g)[5], 1383(c)(3)[6]; *Schaudeck v. Comm'r of Soc. Sec.*, 181 F. 3d 429, 431 (3d Cir. 1999). Section 405(g) permits a district court to review the transcripts and records upon which a determination of the Commissioner is based; the court will review the record as a whole. *See* 5 U.S.C. §706. The district court must then determine whether substantial evidence existed in the record to support the Commissioner's findings of fact. *Burns v. Barnhart,* 312 F. 3d 113, 118 (3d Cir. 2002).

---

[5] Section 405(g) provides in pertinent part:

> Any individual, after any final decision of the [Commissioner] made after a hearing to which he was a party, irrespective of the amount in controversy, may obtain a review of such decision by a civil action ... brought in the district court of the United States for the judicial district in which the plaintiff resides, or has his principal place of business

42 U.S.C. § 405(g).

[6] Section 1383(c)(3) provides in pertinent part:

> The final determination of the Commissioner of Social Security after a hearing under paragraph (1) shall be subject to judicial review as provided in section 405(g) of this title to the same extent as the Commissioner's final determinations under section 405 of this title.

42 U.S.C. § 1383(c)(3).

Substantial evidence is defined as "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate" to support a conclusion. *Ventura v. Shalala*, 55 F. 3d 900, 901 (3d Cir. 1995) (quoting *Richardson v. Perales,* 402 U.S. 389, 401 (1971)). If the Commissioner's findings of fact are supported by substantial evidence, they are conclusive. 42 U.S.C. § 405(g); *Richardson,* 402 U.S. at 390. When considering a case, a district court cannot conduct a *de novo* review of the Commissioner's decision nor re-weigh the evidence of record; the court can only judge the propriety of the decision in reference to the grounds invoked by the Commissioner when the decision was rendered. *Palmer v. Apfel*, 995 F. Supp. 549, 552 (E.D. Pa. 1998); *S.E.C. v. Chenery Corp.*, 332 U.S. 194, 196-97 (1947). The court will not affirm a determination by substituting what it considers to be a proper basis. *Chenery*, 332 U.S. at 196-97. Further, "even where this court acting *de novo* might have reached a different conclusion . . . so long as the agency's factfinding is supported by substantial evidence, reviewing courts lack power to reverse either those findings or the reasonable regulatory interpretations that an agency manifests in the course of making such findings." *Monsour Medical Center v. Heckler*, 806 F. 2d 1185, 1190-91 (3d. Cir. 1986).

2. Discussion

The ALJ found that Plaintiff's depression, anxiety disorder, PTSD, ADD, learning disability, personality disorder, and status post left elbow injury were severe impairments, but determined at step three that she did not meet a listing. (R. at 20-22). The ALJ found that Plaintiff had the residual functional capacity to perform work at the sedentary level with the following restrictions: she was limited to lifting ten pounds occasionally and two to three pounds frequently; she could stand/walk for one hour; she could sit for eight hours; she could not use the left lower extremity for pushing; she could engage in occasional postural maneuvers; she was

limited in using her left arm for reaching occasionally; she could not perform work that required her to flex the left elbow to its full extent more than 50% of the time; and she was right hand dominant. (R. at 22). The ALJ further found that Plaintiff had the following nonexertional limitations: she was limited to simple, routine, repetitive tasks, not fast paced, with only incidental interaction with co-workers and the public, interaction with a supervisor for only 1/6 of the time, and she was to avoid poor ventilation, vibration, temperature extremes, wetness, dust, and humidity. (R. at 22). At the final step, the ALJ concluded that Plaintiff could perform the jobs of a surveillance system monitor, assembler, and laborer. (R. at 26). Again, we must affirm this determination unless it is not supported by substantial evidence. *See* 42 U.S. C. § 405(g).

Plaintiff's challenges relate to the ALJ's residual functional capacity ("RFC") assessment. "'Residual functional capacity is defined as that which an individual is still able to do despite the limitations caused by his or her impairment(s).'" *Burnett v. Comm'r of Soc. Sec. Admin.*, 220 F.3d 112, 121 (3d Cir. 2000) (quoting *Hartranft v. Apfel*, 181 F.3d 358, 359 n.1 (3d Cir. 1999)); *see also* 20 C.F.R. §§ 404.1545(a); 416.945(a). An individual claimant's RFC is an administrative determination expressly reserved to the Commissioner. 20 C.F.R. §§ 404.1527(e)(2); 416.927(e)(2). In making this determination, the ALJ must consider all the evidence before him. *Burnett*, 220 F.3d at 121. This evidence includes "medical records, observations made during formal medical examinations, descriptions of limitations by the claimant and others, and observations of the claimant's limitations by others." *Fargnoli v. Halter*, 247 F.3d 34, 41 (3d Cir. 2001). Moreover, the ALJ's RFC finding must "be accompanied by a clear and satisfactory explication of the basis on which it rests." *Id*. (quoting *Cotter v. Harris*, 642 F.2d 700, 704 (3d Cir. 1981)).

Plaintiff first challenges the ALJ's RFC assessment with respect to her mental impairments. As set forth above, the ALJ limited Plaintiff to simple, routine, repetitive tasks, not fast paced, with only incidental interaction with co-workers and the public, and interaction with a supervisor for only 1/6 of the time. (R.at 22). Plaintiff contends that this finding is not supported by substantial evidence because the ALJ failed to consider Dr. Tarter and Dr. Mangold's findings that she had moderate limitations in her ability to accept instructions, respond appropriately to criticism from supervisors, and respond appropriately to changes in the work setting. (ECF No. 10 at 9-10).

While Drs. Tarter and Mangold did, in fact, note these limitations, it is clear from their assessments that these findings do not preclude Plaintiff from working. As set forth by Dr. Tarter in the portion of the form entitled "Explanation of Findings," which is a detailed explanation rendered in conjunction with her RFC assessment:

> The claimant's basis memory processes are intact. She is capable of working within a work schedule and at a consistent pace. She could be expected to complete a normal workweek without exacerbation of psychological based symptoms. Her ADL's and social skills are functional. Moreover, she can sustain an ordinary routine and adapt to routine changes without special supervision. She retains the ability to perform repetitive work activities without constant supervision. There are no restrictions in her abilities in regards to understanding and memory.
> …
>
> The claimant is able to meet the basic mental demands of competitive work on a sustained basis despite the limitations resulting from her impairments.

(R. at 400). Similarly, Dr. Mangold concluded that Plaintiff was "mentally capable of performing simple competitive work in a low contact work setting." (R. at 477).

More broadly speaking, we observe that the ALJ did not solely rely on Drs. Tarter and Mangold's assessments in fashioning her RFC, but also examined the Plaintiff's medical records relative to her mental impairments and discussed the various findings contained therein,

considered her course of treatment, considered her work history, and considered her testimony. (R. at 23-24). The ALJ also relied on the assessments of Dr. Bailey, an examining psychologist, observing that Dr. Bailey opined that Plaintiff did not have marked limitations in any area, and that his opinions were consistent with Plaintiff's current GAF score of 62, which indicates only mild difficulty in functioning. (R. at 24). Finally, no treating or examining physician provided an opinion that Plaintiff had functional limitations that would prevent her from engaging in the range of work found by the ALJ. In point of fact, the most recent GAF score cited by the ALJ as consistent with Dr. Bailey's most recent assessment was rendered in February 2012 by Dr. Simora, Plaintiff's treating psychiatrist. (R. at 527). We therefore find no error in the ALJ's RFC assessment relating to Plaintiff's mental impairments.

Plaintiff's argument with respect to the ALJ's RFC assessment regarding her physical impairment fairs no better. Plaintiff specifically argues that "[t]here is no indication where sitting for 8 hours was supported by the evidence." (ECF No. 10 at 11). Plaintiff acknowledges, however, that Dr. Kalata, the consulting examiner, opined that Plaintiff had no limitations in sitting. (R. at 436). Dr. Kalata's assessment in this regard was based upon his physical examination of the Plaintiff, and Plaintiff points to no evidence in the record to the contrary. Accordingly, we find this argument unfounded.

Plaintiff's next argument that the ALJ was biased against her and/or her attorney merits little discussion and can be dispensed with quickly. Due process requires that social security claimants be afforded a full and fair hearing. *Ventura v. Shalala*, 55 F.3d 900, 902 (3d Cir. 1995). This standard is violated where a claimant is deprived of the opportunity to present evidence to an ALJ in support of his or her claim, or where the ALJ exhibits bias or animus against the claimant. *Id*. at 902-03. Here, Plaintiff claims that the ALJ demonstrated a "bias"

against her when he asked her attorney if he had provided all relevant materials to him for considering her claim, and "basically accused [her] attorney of forgery and other legal malpractice" when he stated that it was his intent to subpoena medical records to verify the completeness of the record. (ECF No. 10 at 11-12). As pointed out by the Commissioner, however, the ALJ clearly stated that he did not suspect Plaintiff's attorney of any impropriety, but rather, his request was simply being made on a random basis. (R. at 36-37). Moreover, a party asserting bias must show that the behavior of the ALJ was "so extreme as to display clear inability to render fair judgment." *Liteky v. United States*, 510 U.S. 540, 551, 114 S.Ct. 1147, 127 L.Ed.2d 474 (1994); *Fraser v. Astrue*, 373 Fed. Appx. 222, 225 (3d Cir. 2010) (rejecting claimant's argument that bias was demonstrated when ALJ "snapped" at claimant's lawyer). In light of this standard, Plaintiff's claims of bias on this record is unavailing.

Plaintiff further challenges the ALJ's reliance on the vocational expert's testimony. Because we have concluded, as set forth above, that the ALJ's RFC assessment was supported by substantial evidence, it follows that the hypothetical question posed to the vocational expert adequately portrayed Plaintiff's limitations. To the extent Plaintiff argues that the ALJ failed to make an individualized assessment of her ability to cope with stress contrary to the requirements of *SSR* 85-15, we reject this contention. *SSR* 85-15 provides that a claimant's reaction to the demands of work is "highly individualized," and a mentally impaired claimant may have difficulty meeting the requirements of even "low-stress" jobs. *SSR* 85-15, 1985 WL 56857 at *6. Any impairment-related limitations created by an individual's responses to the demands of work "must be reflected in the RFC assessment." *Id*. Here, the ALJ specifically accounted for her individual limitations by restricting her to simple, routine, repetitive tasks, not fast paced, with

only incidental interaction with co-workers and the public, and interaction with a supervisor for only 1/6 of the time. (R. at 22). The ALJ therefore satisfied the requirements of *SSR* 85-15.

Finally, Plaintiff challenges the ALJ's reliance on the vocational expert's testimony since he failed to identify the specific Dictionary of Occupational Titles ("DOT") position numbers for the position titles to which he testified. *See* (ECF No. 10 at 13-14). We reject this argument, since there is "no legal basis for [the plaintiff's] argument that 'if the claimant is to adequately test the accuracy of the VE testimony, the DOT numbers must be available.'" *Irelan v. Barnhart*, 82 Fed. Appx. 66, 72 (3d Cir. 2003); *see also Haas v. Barnhart*, 91 Fed. Appx. 942, 948 (5th Cir. 2004) (rejecting plaintiff's argument noting plaintiff "cites no support for his claim that the DOT numbers for positions identified by the VE must be given"); *Strong v. Comm'r of Soc. Sec.*, 2013 WL 5671267 at *6 (W.D.Pa. 2013) (observing that the failure of the VE to provide DOT numbers was not, "in and of itself," error); *Mistick v. Colvin*, 2013 WL 5288261 at *3 (W.D.Pa. 2013) ("There is no case law suggesting that a vocational expert is required to provide DOT numbers in support of his claim of DOT-consistency."); *Nahory v. Colvin*, 2013 WL 3943512 at *3 (W.D.Pa. 2013) (rejecting plaintiff's argument that VE was required to provide the specific DOT numbers of the jobs to which he referred in order for the ALJ to determine whether a conflict existed, noting that *SSR* 00-04p did not require that level of specificity). Moreover, Plaintiff has not shown "that the vocational expert did not account for the possibility that Plaintiff could not engage in some jobs within the elicited occupational categories when he provided the numbers." *Mistick*, 2013 WL 5288261 at *3. We therefore find no error in this regard.

### C. CONCLUSION

Based upon the foregoing, we conclude that the ALJ's findings were supported by substantial evidence and he complied with applicable law. Accordingly, it is respectfully recommended that Plaintiff's Motion for Summary Judgment (ECF No. 9) be denied, Defendant's Motion for Summary Judgment (ECF No. 11) be granted, and the decision of the ALJ be affirmed.

In accordance with the Magistrate Judges Act, 28 U.S.C. § 636(b)(1)(B) and (C), and Rule 72.D.2 of the Local Rules of Court, the parties are allowed fourteen (14) days from the date of service of a copy of this Report and Recommendation to file objections. Any party opposing the objections shall have fourteen (14) days from the date of service of objections to respond thereto. Failure to file timely objections will constitute a waiver of any appellate rights.

February 6, 2014

_s/ Susan Paradise Baxter_
Susan Paradise Baxter
United States Magistrate Judge

cc/ecf: All counsel of record.